**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

| | | |
|---|---|---|
| KRISTEN GARDNER HUNTER, as Executor of the Estate of RANDALL DON HUNTER, *et al.,* | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CV419-174 |
| UNITED STATES OF AMERICA, | ) ) | |
| Defendant. | ) | |

## <u>ORDER</u>

Plaintiff Kristen Gardner Hunter, the Executrix of the Estate of Randall Don Hunter, and as surviving spouse of Randall Don Hunter and guardian of his two minor children, filed this case against the United States of America arising out of an airplane crash on August 28, 2017, that resulted in the death of the pilot, Plaintiff's decedent. *See* doc. 89 at 5-13. After a lengthy discovery process, the United States filed motions to exclude testimony from three of Plaintiff's expert witnesses. *See* docs. 230, 231, & 232. Plaintiff responded, docs. 249, 254, & 255, and the United States replied, docs. 271, 272, and 273. The Motions are ripe for review.

## Background[1]

At approximately 8:30 a.m. local time on August 28, 2017, a single-engine Beechcraft A36 Bonanza airplane registered as N87RY and piloted by Randall Hunter ("Pilot Hunter") took off from the Savannah/Hilton Head International Airport ("Savannah Airport") with two passengers onboard.  Doc. 89 at 6, 8; *see also* doc. 230 at 1. Approximately five minutes into the flight, at 8:35:46 a.m., Pilot Hunter contacted the Savannah Air Traffic Control (ATC) and declared an emergency, advising ATC that he had a total engine failure and needed to land.  Doc. 89 at 8; *see also* doc. 254-8 at 2.  At 8:35:55 a.m., the air traffic controller on duty at the North Radar position in the Savannah ATC Tower (the "Controller") asked Pilot Hunter whether he wanted to return to the Savannah Airport or go to an airport in Statesboro, Georgia. Doc. 89 at 8; *see also* doc. 254-8 at 2.  In response, Pilot Hunter indicated he would go to Statesboro, because he was "not going to make [S]avannah."  Doc. 254-8 at 2.  However, at 8:36:34, when the Controller informed Pilot Hunter that Statesboro was twenty miles away, he

---

[1] Where necessary, the Court includes more specific factual background below when analyzing the challenges to a particular expert's testimony.

responded that he likely would not make it to Statesboro.  Doc. 89 at 10; *see also* doc. 254-8 at 3.  Then, at 8:36:39, the Controller informed Pilot Hunter of a closer airport, Cypress Lakes.  Doc. 89 at 10; *see also* doc. 254-8 at 3.  Pilot Hunter responded that he was "going there."  Doc. 254-8 at 3.  A little over three minutes later the Controller stated that he lost radar contact with the aircraft.  *Id.*  The airplane crashed in a wooded area approximately five miles from Cypress Lakes.  Doc. 230 at 2; *see also* doc. 89 at 11.  Pilot Hunter and his passengers all died as a result.  Doc. 230 at 2; *see also* doc. 89 at 6.

Plaintiff's Second Amended Complaint alleges negligence claims against the United States under the Federal Tort Claims Act.  Doc. 89 at 13-19.  Plaintiff alleges that, "had the [Controller] provided pilot Hunter with the location of the Cypress Lakes Airport at the time of the declaration of the initial emergency, as he was required to do, the subject aircraft would have reached Cypress Lakes Airport as it was well within the subject aircraft's glide range at the onset of the emergency."  *Id.* at 11.  She further alleges that "another airport, namely Briggs Field Airport, was likewise much closer to the subject aircraft's position at the time of the onset of the emergency than was the Statesboro Airport, and

3

had the [Controller] provided the subject aircraft with the location of Briggs Field Airport, as he was required to do, the subject aircraft would have been able to make Briggs Field as it too was well within the glide range of the powerless aircraft at the onset of the emergency." *Id.* The United States disputes liability, and denies that the two closer airports, Briggs Field and Cypress Lakes, were within the disabled aircraft's glide range at the time of the onset of the emergency. *See generally* doc. 90.

Plaintiff identified Mark N. Callender, Ph.D., Charles Pereira, and Matthew Robinson as experts to support her allegations. *See* doc. 254-3 (Callender A36 Flight Test and Glide Performance Report); doc. 254-4 (Callender Rebuttal Report); doc. 254-5 (Callender Report Supplement Regarding Wind Data and TKS Installation); doc. 254-6 (Callender Addendum to Report Supplement); doc. 254-19 (Callender Report Supplement Regarding Deposition Questions); doc. 255-13 (Pereira Report); doc. 232-1 (Robinson Report); doc. 249-1 at 40-44 (Robinson Supplemental Report). The United States challenges each expert's opinions. Docs. 230, 231 & 232. After discussing the applicable legal standard, the Court addresses those challenges in turn.

4

## Governing Legal Standard

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), the United States Supreme Court interpreted Federal Rule of Evidence 702 which governs expert testimony. The Supreme Court "made abundantly clear" that Rule 702 "compels the district courts to perform the critical 'gatekeeping' function concerning the admissibility of expert scientific evidence." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (citing *Daubert*, 509 U.S. at 589 n. 7, 597) (emphasis omitted). The Supreme Court later held that "Daubert's general holding–setting forth the trial judge's general 'gatekeeping' obligation–applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (citing Fed. R. Evid. 702). Having incorporated these decisions, Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a)   the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)   the testimony is based on sufficient facts or data;

(c)    the testimony is the product of reliable principles and methods; and

(d)    the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The Eleventh Circuit has established a three-pronged inquiry encompassing the requirements of *Daubert*, its progeny, and Rule 702. Under this inquiry, a court determining the admissibility of expert testimony must consider whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Frazier*, 387 F.3d at 1260 (citations omitted); *see also Prosper v. Martin*, 989 F.3d 1242, 1249 (11th Cir. 2021).  The proponent of the expert bears the burden of establishing qualification, reliability, and helpfulness by a preponderance of the evidence.  *Daubert*, 509 U.S. at 592, n. 10.

For the first prong, "experts may be qualified in various ways. While scientific training or education may provide possible means to qualify, experience in a field may offer another path to expert status." *Frazier*, 387 F.3d at 1260-61; *see also* Fed. R. Evid. 702 ("A witness may

6

be qualified as an expert by "knowledge, skill, experience, training, or education."). In determining qualification, courts generally look to a proposed expert's education and experience and ask whether the witness's intended testimony is sufficiently within his or her area of expertise. *See Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001). However, "the unremarkable observation that an expert may be qualified by experience does not mean that experience, standing alone, is a sufficient foundation rendering reliable any conceivable opinion the expert may express." *Frazier*, 387 F.3d at 1261 (emphasis in original).

Consequently, reliability, the second prong, "remains a discrete, independent, and important requirement for admissibility." *Frazier*, 387 F.3d at 1261. The Supreme Court in *Daubert* "set out a list of 'general observations' for determining whether expert testimony is sufficiently reliable to be admitted under Rule 702." *United States v. Brown*, 415 F.3d 1257, 1267 (11th Cir. 2005) (citation omitted). These factors or observations inquire into the expert's "theory or technique" and are: "(1) whether it can be (and has been) tested; (2) whether it has been subjected to peer review and publication; (3) what its known or potential rate of error is, and whether standards controlling its operation exist; and (4)

whether it is generally accepted in the field." *Id.* (citation omitted). "Sometimes the specific *Daubert* factors will aid in determining reliability; sometimes other questions may be more useful. As a result, 'the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.'" *Frazier*, 387 F.3d at 1262 (quoting *Kumho Tire*, 526 U.S. at 152). "Indeed, the Committee Note to the 2000 Amendments of Rule 702 expressly says that, '[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" *Id.* at 1261 (emphasis in original).

Finally, expert opinion testimony must also assist the trier of fact. Fed. R. Evid. 702(a). "By this requirement, expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person." *Frazier*, 387 F.3d at 1262 (citation omitted). Proffered expert testimony generally will not help the trier of fact, and is inadmissible, "when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Cook v. Sheriff of Monroe Cnty.*,

8

402 F.3d 1092, 1111 (11th Cir. 2005) (citation omitted). Stated differently, expert testimony that offers something "beyond the understanding and experience of the average citizen" helps the trier of fact and can be admitted. *Id.* (parenthetically quoting *United States v. Rouco*, 765 F.2d 983, 995 (11th Cir. 1985)). Additionally, to be helpful, the expert's testimony must be relevant. *Daubert*, 509 U.S. at 591-92. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id.* at 591 (internal citation and quotations omitted).

### Plaintiff's Expert Mark N. Callender, Ph.D.

Plaintiff identified Mark N. Callender, Ph.D., as an expert aerodynamicist. Doc. 254 at 2; *see also* doc. 254-3 (Callender A36 Flight Test and Glide Performance Report); doc. 254-4 (Callender Rebuttal Report); doc. 254-5 (Callender Report Supplement Regarding Wind Data and TKS Installation); doc. 254-6 (Callender Addendum to Report Supplement); doc. 254-19 (Report Supplement Regarding Deposition Questions).[2] The United States moves to exclude his testimony. Doc.

---

[2] In the discussion below, the Court cites to the copies of Callender's various reports attached to Plaintiff's brief. For simplicity, the Court has not included parallel citations where those reports are filed elsewhere in the record.

230.   Before turning to the United States' substantive challenges to Callender's opinions, the Court must first address its suggestion, made in a footnote, that Callender's Report Supplement Regarding Wind Data and TKS Installation, doc. 254-5, and the Addendum to that Supplement, doc. 254-6, should be excluded as improperly "designed to cure a significant omission in Callender's original report."   Doc. 230 at 6 n. 6 (citing *Green v. COSCO Shipping Lines Co. Ltd.*, 2023 WL 2137117, at *2 (S.D. Ga. Feb. 21, 2023)).

The Federal Rules of Civil Procedure require a party seeking to introduce expert testimony at trial to disclose the identity of the expert along with an expert report containing:

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them; (iii) any exhibits that will be used to summarize or support them; (iv) the witness's qualifications . . . ; (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and (vi) a statement of the compensation to be paid for the study and testimony in the case.

Fed. R. Civ. P. 26(a)(2)(A)-(B).   These disclosures must be made "at the times and in the sequence that the court orders."   Fed. R. Civ. P. 26(a)(2)(D).   A party has a continuing obligation to supplement its

expert's report. Fed. R. Civ. P. 26(a)(2)(E). However, the duty to "supplement" a report does not render the initial duty of complete and timely disclosure toothless. *Hamlett v. Carroll Fulmer Logistics Corp.*, 176 F. Supp. 3d 1360, 1363 n.5 (S.D. Ga. 2016) ("[T]he rules and case law require timely disclosure and timely supplementation; trial by ambush is not permitted. Nor are reports that are blatantly untimely or rely on supplementation to dodge a deadline.").

"If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). " 'The party failing to comply with Rule 26(a) bears the burden of establishing that its non-disclosure was either substantially justified or harmless.'" *Caviness v. Holland*, 2011 WL 13160390, at *2 (S.D. Ga. Mar. 17, 2011) (quoting *Hewitt v. Liberty Mut. Grp., Inc.*, 268 F.R.D. 681, 683 (M.D. Fla. 2010)). "A failure to timely make the required disclosures is harmless when there is no prejudice to the party entitled to the disclosure." *Hewitt*, 268 F.R.D. at 683.

Here, the Court need not determine whether Plaintiffs improperly supplemented Callender's original expert report, because even if they did, any untimeliness was harmless. The United States concedes that Callendar was offered for a second deposition after he produced the supplemental reports. Doc. 230 at 7. As Plaintiff compellingly argues, "all spreadsheets and supplements were supplied long before the close of expert discovery, and the United States suffered no prejudice." Doc. 254 at 8. Since, even if the Court were to find Plaintiff untimely produced any of Callender's opinions, that untimely production was harmless, the United States' request to exclude any opinion on this ground is **DENIED**. Doc. 230, in part.

Having resolved the parties' procedural dispute, the Court turns to the United States' substantive challenges to Callender's opinions. As the United States observes in its Motion, a "key question" in this case is "whether the accident airplane would have reached Cypress Lakes or Briggs Field but for the [C]ontroller's alleged negligence." Doc. 271 at 4. In aid of their position on this question, Plaintiff explains that Callender determined "the best glide range and speed for the A36 Bonanza," which he then used to determine "how far the aircraft can glide." Doc. 254 at 4-

5 (citing doc. 254-3 at 6-11). Then, with this information, "Dr. Callender answered hypotheticals to demonstrate what was possible had ATC performed properly and/or had the plane been flown according to the recommended configuration." *Id.* at 5.

Callendar's initial Report explains that he conducted flight tests in an A36 Beech Bonanza equipped with the same engine and propeller as N87RY. Doc. 254-3 at 6. He utilized a method called the "Sawtooth Climb and Descent (SCD)," and explained how the SCD runs were carried out. *Id.* at 6-8. Using the data collected during the flight tests, including the indicated airspeed (IAS), pressure altitude ($h_p$), outside air temperature (OAT), fuel quantity, and elapsed time ($\Delta t$), he calculated the airplane's "sink rate (SR)" (Equation 1), corrected the SR for nonstandard temperature ($SR_{corr}$) (Equation 2), calculated the airplane's required horsepower ($HP_R$) (Equation 3), calculated the airplane's corrected power (PIW) (Equation 4), calculated the calibrated airspeeds (CAS) (Equation 5), corrected the CAS values to calculate the corrected airspeeds (VIW) (Equation 6), then created a "plot of PIW vs VIW" to identify "the airplane's best glide airspeed ($V_G$)." *Id.* at 8-10. The CAS values were then corrected for density, to arrive at the true airspeed

(TAS) (Equation 7). *Id.* at 10. "Using TAS and the corrected SR, the airplane's glide angle ($y$) and L/D[3] were calculated (Equations 8 & 9)." *Id.* Callendar then plotted L/D vs IAS, applied a curve fit, and determined the airplane's $(L/D)_{max}$, or glide ratio, to be 11.92. *Id.* at 11. The "POH," or "airplane operating handbook," *id.* at 5, identifies the airplane's "Glide Ratio" as "1.7 nautical miles . . . per 1000 feet of altitude," doc. 230-4 at 2, which Callender calculates as a value of 10.33, doc. 254-3 at 11.

The United States summarizes that "Dr. Callender has produced 16 tables with 64 separate glide predictions, each of which is based on one of five different glide ratios . . . ." Doc. 230 at 8. Plaintiff argues these "tables and hypotheticals" are not separate opinions, but instead Callender "produced one opinion regarding the maximum glide ratio of an A36 Bonanza" and this opinion, along with "the separate conservative glide ratio from the [N87RY's Pilot Operating Handbook ("POH")] are the bases of the spreadsheets." Doc. 254 at 6-8. Callender's initial Report explains that, based on his calculation of the airplane's glide ratio, he

---

3 Elsewhere, Callender explains that L/D is the ratio of lift over drag. Doc. 254-3 at 4-5. The $(L/D)_{max}$ for an airplane is equivalent to the airplane's best glide ratio, or GR. *Id.* at 5. "An airplane's GR is used by a pilot to determine how far an airplane can glide in the event of an engine failure." *Id.*

could then determine the aircraft's glide range.  Doc. 254-3 at 11-12.  He calculated the glide range "beginning five seconds prior to the point that an emergency was declared to the two closest airports: GA35 and GA43." *Id.* at 12.   He relied on admitted assumptions to complete these calculations: "1) the airplane is flown at the published $V_G$ [best glide airspeed, *see id.* at 9,] of 110 [knots indicated airspeed, "KIAS"], 2) a constant ground track is held until 13 seconds after the emergency was declared, 3) turns are at constant bank angles, and 4) the airplane's propeller is windmilling." *Id.* at 13.  Additionally, "[t]he glide calculations were performed using the meteorological conditions reported at the time of the accident."  *Id.*

Callender's initial Report includes the calculated glide paths to Cypress Lakes (identified as GA35), using his calculated GR of 11.9, and four different bank angles, 15°, 30°, 45°, and 60° for the turns.  Doc. 254-3 at 16.  The Report includes the same calculations for Briggs Field (identified as GA43).  *Id.* at 17.  It also includes the glide range calculations for both Cypress Lakes and Briggs Field using the POH GR of 10.33, with the same four bank angles.  *Id.* at 19-20.  His Report Supplement Regarding Wind Data and TKS Installation includes

15

"additional glide ratio tables to GA35 and GA43." Doc. 254-5 at 1. These tables, which, like those in the original report, include glide paths to both GA35 and GA43 using a GR of 11.9 and a GR of 10.33 with bank angles of 15°, 30°, 45°, and 60°, include updated calculations based on different wind data. *Id.* at 5-7. The supplement also includes two tables that contain glide path calculations to GA43, using two sets of wind data, with an air speed of 80 KIAS, "an approximated average airspeed recorded for N87RY after the emergency was declared and during the accident sequence." *Id.* at 8. His final supplement includes a table showing "glide prediction data for an A36 Bonanza to GA35 at 80 KIAS" with a GR of 10.22. Doc. 254-19 at 1. The 10.22 GR was calculated "based upon an approximated average airspeed recorded for N87RY after the emergency was declared and during the accident sequence." *Id.*

The United States challenges Callender's "hypothetical glide predictions to Cypress Lakes and Briggs Field." Doc. 230 at 4 (emphasis and quotations omitted). It seeks to exclude these "hypothetical glide predictions" as not properly tested, *id.* at 12-17, based on speculation, *id.* at 17-30, based on improper reliance on modeled winds, *id.* at 30-32, based on unvalidated geographic data, *id.* at 32-33, and based on an

unverified predicate, *id.* at 33-34.  Plaintiff opposes these arguments.  *See* doc. 254 at 15-31.[4]

### 1. Callender's "Testing" of Hypothetical Glide Predictions.

The United States criticizes what it characterizes as Callender's "attempt[ ] to validate the exemplar glide ratio of 11.9 to 1 for use in his hypothetical glide predictions."  Doc. 230 at 12.  Relying on a portion of Callender's rebuttal report where Callender responds to opinions from a non-party's expert Douglas Stimpson,[5] the United States argues Callender incorrectly applied his methodology in determining that the aircraft's actual glide performance "is well represented by the flight test data."  Doc. 230 at 13.  In considering Stimpson's opinion that "Pilot Hunter was able to achieve near-textbook maximum glide distance (6.4 v. 6.63 n.m.) even with a 180-degree turn," Callender opined that "[t]he distance covered by N87RY, given the turn that it performed and the

[4]   In opposing these substantive challenges, Plaintiff observes that Callender's qualifications as an aerodynamicist are "unchallenged."  Doc. 254 at 15.  Plaintiff nevertheless discusses his qualifications, both educational and experiential.  *Id.* at 13-15.  Plaintiffs have borne their burden, unchallenged by the United Sates, that Callender is qualified as an aerodynamicist.

[5] Stimpson was identified as an expert by Defendants Aviation Development Group, LLC and Thomas Huff in the related case *Cocke v. United States*, 4:19-cv-169 (S.D. Ga. July 12, 2019).  Callender was also disclosed as an expert by the Plaintiffs in that case.  *See* doc. 230 at 1 n.1.

suboptimal airspeed it had throughout the glide, is only possible if its glide ratio was significantly higher than the handbook value." Doc. 254-4 at 6. Callender then applied the "suboptimal airspeed of 85 KIAS" to reveal a glide ratio "of approximately 10.6." *Id.* He then opined that, "[c]alculating the altitude lost in a low bank angle 180° turn along with the altitude lost in a straight and level glide with a glide ratio of 10.6 results in a total glide distance of approximately 6.3 NM," which "is consistent with the distance covered by N87RY, which verifies that its glide performance is well represented by the flight test data obtained using [the exemplar A36 Bonanza]." *Id.*

The United States argues this "attempt to validate the airplane's actual glide ratio" is unreliable because it fails to account for wind, Callender did not know whether he was calculating a glide along the actual flight path of the accident airplane, and Callender did not verify that 85 knots was the proper airspeed to use for this analysis. Doc. 230 at 13-16. Plaintiff observes, in response, that Callender was not attempting to validate his calculated glide ratio, but providing his own explanation of Stimpson's opinion. Doc. 254 at 17-18. She further argues that Callender's analysis was not designed to "test" any of his

18

"hypothetical paths against what N87RY did the day of the crash." *Id.* at 17. As for the specific challenges to the opinion, Plaintiff argues that these challenges go to the weight of Callender's opinion, and not its admissibility. *Id.* Plaintiff is correct.

The United States' motion concedes that "[t]here is nothing inherently improper about [Callender's] methodology." Doc. 230 at 13. Instead, it argues "several critical factors" in its application "were either overlooked or simply ignored." *Id.* These are the types of criticisms that "impugn the accuracy of his results, not the general scientific validity of his methods." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1345 (11th Cir. 2003). The identification of these types of flaws "is precisely the role of cross-examination." *Id.* As the Eleventh Circuit has observed, based on the Supreme Court's decision in *Bazemore v. Friday*, 478 U.S. 385 (1986), "normally, failure to include variables will affect the analysis' probativeness, not its admissibility." *Quiet Tech. DC-8*, 326 F.3d at 1346 (internal quotations and alteration omitted). Any reliance on assumptions, or even questionable data, in performing otherwise reliable and acceptable calculations does not render the ultimate opinion inadmissible; those are matters for cross-examination. *See id.*; *see also,*

*e.g. United States v. Markovich*, 95 F.4th 1367, 1377-78 (11th Cir. 2024) (vigorous cross-examination and jury instructions "are the appropriate means of attacking shaky but admissible evidence." (internal citations and quotations omitted). The United States' request to exclude Callender's opinions on this ground is, therefore, **DENIED**. Doc. 230, in part.

### 2. Callender's Assumptions Underlying His Glide Predictions.

The United States next argues that Callender's hypothetical glide predictions should all be excluded because they are calculated using "five different assumed glide ratios," and those glide ratios each "requires its own set of assumed conditions which either knowingly did not exist during the accident flight or remain unknown by Callender." Doc. 230 at 17. Specifically, the United States challenges the assumptions made about the airplane's speed, *id.* at 17-20, the rotation and position of the propeller, *id.* at 20-24, the airplane's bank angle, *id.* at 24-25, the airplane's weight, *id.* at 25-28, and the timing of a turn to the selected airport, *id.* at 28-30.

The United States argues that the airplane's speed was "less than 110 knots after the reported engine failure." Doc. 230 at 17. Therefore,

it challenges Callender's original glide predictions, which assume an air speed of 110 knots, and further challenge his reliance on a constant speed, even though "the undisputed evidence shows it was not." *Id.* at 18. It argues the glide predictions are inadmissible because, while they "may be academically interesting, . . . they do not answer the question posed by Plaintiff's Complaint, *i.e.*, whether the accident airplane would have safely landed at Cypress Lakes or Briggs Field but for the controller's alleged negligence." *Id.* The predictions are, in the United States' view, unhelpful. *Id.* The United States' helpfulness argument is unavailing. "To be admissible, an expert's testimony need not independently satisfy Plaintiff's burdens as to breach or causation. The standard for 'assisting the trier of fact' is gentler than that." *Hudgens v. Durrence*, 2008 WL 6839019, at *3 (S.D. Ga. Dec. 30, 2008) (quoting *Daubert*, 509 U.S. at 591-92) (alterations omitted)). Plaintiff explains that the 110 knots speed was taken from the airplane's POH, and therefore tied to the facts of the case. Doc. 254 at 20. Callender's calculations based on an assumed airplane speed of 110 are, therefore, helpful.

Additionally, Callender is permitted to base his calculations on assumptions, and that reliance does not render his methodology unreliable. As the United States concedes, "experts are permitted to offer opinions that rely on assumptions . . . [that] have some basis in the record." Doc. 230 at 17 (citing *AZZ, Inc. v. S. Nuclear Op. Co., Inc.*, 2023 WL 2746033, at \*10 (S.D. Ga. Mar. 31, 2023)). Plaintiff's response explains that Callender's assumed airspeeds were either the POH max glide range speed or other airspeeds that N87RY undisputedly flew, whether transitorily or for extended periods of time. *See* doc. 254 at 20. The United States does not challenge Callender's calculations, but the data he input into those calculations. Because Plaintiff is correct, and he is permitted to base his opinions on these express assumptions, the United States' arguments about the validity of his data are for cross-examination. "The information experts rely on generally goes to weight not admissibility. [Cit.] The identification of flawed data or facts relied upon by an expert is precisely the role of cross-examination." *Griffin v. Coffee Cnty.*, 623 F. Supp. 3d 1365, 1378 (S.D. Ga. 2022) (internal citation, alteration, and quotations omitted).

22

The United States' arguments about the propeller are twofold. First, it asks the Court to exclude any opinion from Callender "concerning the airplane's glide ratio with a stopped propeller," since no expert has offered a clear opinion that the propeller was indeed stopped. Doc. 230 at 20-21. Second, they ask the Court to exclude Callender's glide predictions based on the propeller being in the "full aft position," since Callender does not know the propeller's position, and bases it on the maximum glide configuration in the POH. *Id.* at 21-24. As with the assumed airplane speed, this is the type of potentially "flawed data" that the United States can explore on cross-examination. So too his reliance on assumed, or hypothetical, bank angles, weight, and turns. *See* doc. 230 at 24-30. The formulas used for the calculations themselves remain reliable.

Overall, Callender may testify about the results of his test flight and his calculations of various glide ranges based on those results, even if they contain assumptions, or are based on hypothetical scenarios. He is clear about the assumptions made, the assumptions were based on scenarios "within the capability of the aircraft," doc. 254 at 24, and the hypotheticals are closely tied to a main issue in this case. Therefore, the

opinions are within the realm of admissible expert testimony. *See Griffin*, 623 F. Supp. 3d at 1376. The critiques of his opinions all go to the weight, and not admissibility, of his testimony. *Quiet Tech. DC-8*, 326 F.3d at 1346. The United States' request to exclude his opinions as speculative is, therefore, **DENIED**. Doc. 230, in part.

### 3.   Callender's Reliance on Modeled Winds.

The United States next argues that Callender improperly relied on "modeled winds" in conducting his calculations of the various glide ranges. Doc. 230 at 30-32. Unlike the case cited by the United States in its Motion, *see id.* at 32 (citing *Grayson v. No Labels, Inc.*, 599 F. Supp. 3d 1184, 1193 (M.D. Fla. 2022)), Callender does not improperly bolster another expert's opinion by blindly relying on it; instead, Callender used data points from multiple experts as input into his own calculations. *See* doc. 254 at 28. If the United States wishes to challenge Callender's testimony as based on incorrect assumptions, or imprecise data, they may do so on cross-examination. *Rosenfeld v. Oceania Cruises, Inc.*, 654 F.3d 1190, 1194 (11th Cir. 2011). The request to exclude on this ground is **DENIED**. Doc. 230, in part.

4.    **Callender's Reliance on Provided Geographical Data and Assumptions about the Location of Briggs Field.**

For the same reasons as those discussed above concerning the assumptions underlying Callender's glide predictions, exclusion is not the appropriate remedy for the United States' challenges to Callender's reliance on data provided by counsel as to "the direction and the distance" of the start position for his calculations, and the exact location of Briggs Field. *See* doc. 230 at 32-33. The methodology, *i.e.*, the formulas used for his calculations, is indisputably reliable. The data or information used to complete those calculations can be challenged on cross examination. *See Rosenfeld*, 654 F.3d at 1194 (rejecting reliability challenge based on alleged "incorrect assumptions"). The request to exclude on this ground is, therefore, **DENIED**. Doc. 230, in part.

### Plaintiff's Expert Charles Pereira

Plaintiff retained Charles M. Pereira to prepare flight path and event reconstruction of the accident flight with associated animations, and to create flight paths for hypothetical post-engine failure scenarios. Doc. 231 at 2; *see also* doc. 255-13 (Pereira Expert Report). The United States moves to exclude Pereira's "flight path reconstruction and animation" and "hypothetical paths to Cypress Lakes and Briggs Field,"

since his work was created using software created by a third-party named Dennis Crider. Doc. 231 at 9;[6] *see also id.* at 3-4. Plaintiff responded in opposition, doc. 255, and the United States replied, doc. 272.

According to his Expert Report, Pereira used data identified in the Report[7] "to develop a ground and flight path for the accident airplane" and "to develop ground and flight paths for hypothetical post-engine failure scenarios." Doc. 255-13 at 4. He then "created animations during this process to visually depict, correlate, and confirm these data which reflect the actual flight path of the accident airplane as well as timing aspects of the hypothetical scenarios." *Id.* at 5. Therefore, Pereira's work can be divided into three broad categories: (1) "[f]light path and event reconstruction for the accident flight," *id.* at 4; (2) "[f]light path and event analysis for hypothetical post-engine failure scenarios involving various ATC and pilot actions for the windmilling prop and stopped prop conditions with glide ratios from the A36 AFM/POH (GR=10.33) and the Texas flight tests (GR=11.90)," *id.*; and (3) "create[ing] animations . . . to visually depict, correlate, and confirm these data which reflect the actual

---

[6] The United States also challenges Pereira's hypothetical flight paths as based on speculation. Doc. 231 at 9-27.

[7] The data he reviewed is listed in his Report at doc. 255-13 at 3-4.

26

flight path of the accident airplane as well as timing aspects of the hypothetical scenarios," *id.* at 5.

Before discussing the disputed issues, the Court will clarify some terminology. First, as to the "hypothetical post-engine failure scenarios" described in his report, *see* doc. 255-13 at 4, Pereira testified that he considers those to be "simulations." *See* doc. 231-2 at 20-29; *see also id.* at 7 ("Simulation is using mathematical formulas along with input data to produce output behavior, in this case, of a vehicle, an airplane."). His Report, in Attachment III, includes six pages of "Hypothetical Paths to Airports," doc. 255-13 at 36-42, which Pereira testified correspond to his simulations, doc. 231-2 at 34 (confirming that his file contains "simulations" which "correspond to those hypothetical paths"). Additionally, Pereira created "animations" related to the August 28, 2017 flight and crash of N87RY. Doc. 255-13 at 5; *see also* doc. 231-2 at 7 ("Animation is a visual and sometimes oral, as in this case, depiction of the data and events that occurred up to and including a crash . . . .").[8] For clarity, the Court will refer to the hypothetical post-engine failure

---

[8] Pereira produced these animations in four separate MP-4 files. Doc. 231-2 at 7. These files were submitted to the Court by Plaintiffs in the related *Cocke* case. *See* 4:19-cv-169, doc. 471-3 (S.D. Ga. May 23, 2025).

27

scenarios as "simulations," and the MP-4 recreations of the flight as "animations."[9]

During his deposition, Pereira testified that, to create his flight simulations, he input data, like "the position of the aircraft latitude, longitude and altitude, and the atmospheric data and the lift curve slope of the wing of the airplane," to "derive via a simulation of sorts, pitch, roll, heading, Gs, those sorts of things." Doc. 231-2 at 11. These simulations were created through a program called "Glide," which is a "Java program that was written for this case to analyze the effects of glide ratio and speed and bank angle, various other hypothetical parameters on the glide performance and flight path of the airplane." *Id.* The "output data" from the Glide software is contained in Excel spreadsheets, which are the simulations described above. *Id.*; *see also id.* at 20. The "formulas" used to calculate the simulations are "[e]mbedded" in the Glide software. *Id.* at 11. These formulas, or equations, were not produced as part of Pereira's Report in this case. *Id.* at 20. The Glide program was not discussed, or even mentioned, in his Report. *Id.* at 29.

---

[9] Pereira's animations also include some "simulated" data, including "pitch, bank, track, calibrated airspeed, true airspeed and ground speed." Doc. 231-2 at 109.

His Report contains "output from the Glide program . . . in graphical format." *Id.* at 29-30; *see also* doc. 255-13 at 36-42.

Pereira explained that he and a third-party, Dennis Crider,[10] worked together to create Glide specifically for this case: Pereira "put together a plan and a design scheme for a new piece of software for this accident," and Crider "wrote the code." Doc. 231-2 at 11-12; *see also id.* at 29 ("Glide didn't exist prior to this accident . . ."). According to Pereira's testimony, Glide "uses equations to output theoretical results based off of long-established aerodynamic equations." *Id.* at 20. When asked about those "equations," he described them as "*related to* glide ratio, lift over drag, flight path angle, coefficient lift, angle to tack, pitch attitude." *Id.* (emphasis added). He was not able to identify any of the actual equations contained within the Glide software, explaining they are "numerous and lengthy." *Id.* He also testified that he had "some" involvement with "determining the data input, the data output and the equations that were used" in the Glide software, but "not completely." *Id.* at 18. When asked if he could point to a document that contained the

---

[10] Crider is not an expert in this case and has not provided a report. *See, e.g.*, doc. 231-2 at 29.

equations contained within the Glide software, he referred generally to textbooks he used during his college classes. *Id.* at 21. While Pereira did provide the files containing the "parameters that [he] utilized in the Glide software simulations that [he] performed in this case," which included the data, or values, run through the Glide program, *see id.* at 21-23, the actual equations run by the program using those values remain, at least for the Court, unknown. *See, e.g.*, *id.* at 28 (discussing "long equations that have aerospeed and bank angles, variables" that were prepared by Plaintiff's expert Dr. Callender and then "embedded into the Glide software," but testifying that those formulas are not included in his file). The Glide software itself has not been peer-reviewed. *Id.* at 136. Pereira testified that the software is "essentially self-validating," and that the "equations that go into it have been validated by every aircraft manufacturer in the world for over a hundred years," *id.*, but again confirmed that he could not provide the equations that are embedded in the software, *id.*

Pereira relied on another program created by Crider to create the animations that he produced in this case. *See* doc. 231-2 at 74. Crider "wrote" a program called "LATS_anim." *Id.*; *see also id.* at 77 ("I would

30

have to refer to Dennis for exactly how he coded certain things."). According to Pereira, "all of the different datasets[11] were combined into one continuous . . . file, which, along with the latitude and longitude, gets fed into LATS_anim and outputs the . . . sim file, in this case, and then that sim file is used to drive the animation for pitch, roll, bank, altitude." *Id.* at 75. He testified that the LATS_anim software "does a bunch of calculations." *Id.* at 77. He explained his methodology: Pereira provided files to Crider, and then Crider ran those files through the LATS_anim software, and then "provided the output of that" to Pereira, which Pereira then used for another program, Insight, to create the animation. *Id.* at 77-78. The data file from the LATS_anim software was not produced. *Id.* at 75 (confirming the LATS_anim file is not in Pereira's materials); *see also* doc. 231 at 9.

The United States moves to exclude Pereira's testimony that relies on Crider's work—both LATS_anim and Glide—that generated the data file for his flight path reconstruction and animation. Doc. 231 at 9. It argues that Pereira could not be properly questioned about Crider's work,

---

[11] The "datasets" include data from a Garmin GPS, ADS-B, and Savannah radar. *See* doc. 231-2 at 9; 15; 74-75.

since the software was not produced and Pereira lacked familiarity with the embedded equations to respond to the United States' questioning. *Id.* The Motion points to persuasive authority interpreting Rule 703, *id.,* which explains that an expert "may not simply repeat or adopt the findings of another expert without attempting to assess the validity of the opinions relied upon." *In re Polypropylene Carpet Antitrust Litigation,* 93 F. Supp. 2d 1348, 1357 (N.D. Ga. 2000). As the Northern District of Georgia explained, "courts must ensure that an expert witness is sufficiently familiar with the reasoning or methodology behind the information to permit cross-examination." *Id.*

Plaintiff responds that Pereira's reliance on Crider's work is permissible and does not render his opinions inadmissible. *See* doc. 255 at 15. However, despite Plaintiff's protestations, Pereira's testimony reveals methodological gaps between the data—both factual and assumed—and the final simulations and animations. It is unquestionable, based on Pereira's own testimony, that the simulations are based entirely on the calculations run by the Glide software. Doc. 231-2 at 11, 20. Additionally, the foundation for the animations created by Insight are the calculations run by LATS_anim. *Id.* at 77-78.

Therefore, because the calculations that created these simulations and the basis for the animations remain unknown, despite Plaintiff's arguments to the contrary, she has not borne her burden of demonstrating the reliability of Pereira's testimony or opinions based on his simulations.

As to the output from the Glide software, there are two gaps that render it unreliable for purposes of the *Daubert* analysis. First, although Pereira explained that he "put together a plan and a design scheme" for the software, doc. 231-2 at 11, he was consistently unable to identify the equations underpinning that plan, *see id.* at 20, 28. Second, even if Pereira had been able to clearly identify the mathematical equations underpinning Glide's calculations, the Court would have to rely entirely on his assertion that Crider, a third-party who has not been identified as an expert in this case, took Pereira's "plan" and correctly coded it into the software. The Court does not have anything on which to base its review of Crider's software coding work, which is necessary in this case because, as Pereira readily admits, Glide was created specifically for use in this case. There is nothing to suggest it has been reviewed by anyone other than Crider, who is not here, and Pereira. The Court cannot simply take

33

Pereira's word for its reliability, since, for the following reasons, that does not meet the *Daubert* standard.

The *Daubert* Court described several factors trial judges may use to assess the reliability of proffered scientific testimony, including: (1) whether the theory or technique "can be (and has been) tested," (2) "whether the theory or technique has been subjected to peer review and publication," (3) "in the case of a particular scientific technique, . . . the known or potential rate of error," and (4) whether the theory or technique is generally accepted by the relevant scientific community. *Daubert*, 509 U.S. at 592-94; *see also Rink*, 400 F.3d at 1292 (discussing these factors in the context of assessing an expert's particular scientific technique). In addition, the Supreme Court has noted that, in the context of this analysis, "conclusions and methodology are not entirely distinct from one another." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Viewing Pereira's testimony about the Glide software through the lens of these *Daubert* factors, it does not meet the reliability standard. The calculations embedded in the Glide program underpinning Pereira's simulations have not been tested. Though Pereira implied that the equations are well-known in the industry, referring to "textbooks" as the

source for those equations, the equations embedded in Glide remain unknown. The program has not been peer-reviewed or otherwise tested, as far as the record in this case demonstrates. Pereira's assurances that the software is "self-validating" are not enough. The Court cannot simply take his word for the software's reliability, and, even more apparent, the Court cannot take *his* word that Crider's word is enough. "Although experts 'commonly extrapolate from existing data . . . nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.' [Cit.] Rather, the trial court is free to 'conclude that there is simply too great an analytical gap between the data and the opinion proffered.'" *Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1194 (11th Cir. 2010) (quoting *Joiner*, 522 U.S. at 146).

The methodology underpinning the LATS_anim software fails the reliability test for similar reasons. Pereira explained that Crider developed LATS_anim, and there is nothing in Pereira's deposition testimony that would satisfy the Court that Crider, who again has not been proffered to speak for himself, developed and coded LATS_anim to perform reliable calculations. Pereira himself was not confident about

what LATS_anim could do, testifying that he would "have to refer to Dennis for exactly how he coded certain things." Doc. 231-2 at 77. Crider created and wrote the LATS_anim software, *id.*, received files from Pereira that he then input into his LATS_anim software, *id.* and then provided the output from LATS_anim to Pereira for him to use in the *Insight* software, *id.* at 77-78. There is no way for the Court to assess the reliability of the calculations run by the LATS_anim software, except to take *both* Pereira *and* Crider's word for it. For the same reasons the Court could not conclude the Glide software was reliable, discussed above, that is not sufficient. *See Frazier*, 387 F.3d at 1261.

Plaintiffs have not borne their burden of demonstrating that Pereira's testimony about his simulations and animations is reliable. Pereira relied on a third-party purported coding expert, Crider, to develop proprietary computer programs to run aerodynamic equations on data inputs to calculate simulations of what a hypothetical aircraft could do. The unknown equations and unknown computer coding underlying Glide and LATS_anim create too significant a methodological gap for the final simulations and animations to meet the reliability required by *Daubert* and Rule 703. Therefore, the United States of America's Motion

36

to Exclude the Testimony of Plaintiffs' Expert Charles Pereira is **GRANTED**. Doc. 231.

### Plaintiff's Expert Matthew Robinson

Plaintiff retained Matthew Robinson to "determine the contributing cases of the crash relating to piloting and aviation human factors." Doc. 232-1 at 3; *see also* doc. 249 at 2 (identifying Robinson as Plaintiff's "piloting and human factors expert). The United States moves to exclude his opinions about air traffic control, doc. 232 at 7-9, his opinion that Pilot Hunter could have made it to Briggs Field, *id.* at 9-12, his opinion that Pilot Hunter could have made it to Cypress Lakes, *id.* at 12-16, and his opinions about Pilot Hunter's state of mind, *id.* at 16-22. Plaintiff responded, doc. 249, and the United States replied, doc. 273.

### 1.    Robinson's Opinions Related to Air Traffic Control

The United States moves to exclude Robinson's opinions about air traffic control, arguing he is unqualified to render them, and they are unreliable. Doc. 232 at 7-8. In response, Plaintiff clarifies that "Robinson will <u>not</u> be rendering any opinions as an expert in [air traffic control] at trial." Doc. 249 at 2. Instead, Robinson's opinions "relate to piloting and human factors when under positive control of [air traffic control] during

an emergency situation, and the reconstruction of the emergency sequence." *Id.* Robinson testified that he is "an expert in the dynamic between pilot and air traffic controller." Doc. 232-2 at 32.

Plaintiff has demonstrated that Robinson is qualified to opine about "the interaction between the pilot and [the air traffic] controller, from the pilot's perspective, during the emergency situation." Doc. 249 at 3-4, 9-10. However, no matter how Plaintiff packages the testimony, Robinson is not qualified to opine about what an air traffic controller was "required" to do or "should" have done. *See, e.g.*, doc. 232-1 at 12 (opining the controller "was required to have knowledge of certain landmarks," and "should have immediately provided heading and distance to [Cypress Lakes]"). In sum, the United States is correct that Plaintiffs have not demonstrated—and do not purport to demonstrate—that Robinson is qualified as an air traffic controller. *See, e.g.*, doc. 249 at 2, 5. Therefore, the United States' request to exclude this testimony is **GRANTED, in part**, and **DENIED, in part**. Doc. 232, in part. Robinson may testify about what a pilot expects from an air traffic controller, but any testimony about what an air traffic controller should do, whether the air traffic controller's actions in this case rose to what Robinson opines is the

38

correct standard, or testimony about perceived failures of the controller in this case is **EXCLUDED**.

## 2.    Robinson's Opinions Related to Briggs Field

Robinson's Report notes that, "[d]uring the emergency, the N87RY was closest to Briggs airfield (GA43), a private airstrip approximately 3.4 miles off the nose of the aircraft." Doc. 232-1 at 9. During his deposition, he testified that it was his opinion that "the chances of making [Briggs Field] in this emergency, the chances would've been greater had not other external factors come into play." Doc. 232-2 at 12. He further explained his analysis that, without "external factors, the chances of making Briggs Field would've been much greater." *Id.* He clarified that he was not opining "that a successful landing could have been made, but that the chances would've been much greater had undue delay and circumstances not . . . convoluted the situation." *Id.*

When asked about his analysis behind this opinion, he testified "Briggs would've been the most viable option straight ahead at his altitude and without the turn or the altitude loss, the aircraft would've been in a much better position to effectively execute emergency landing at . . . that airfield." Doc. 232-2 at 12. When pressed, he conceded there

was no "calculation" done, but explained that the aircraft "was close enough to where [Pilot Hunter] could have . . . made that." *Id.* He testified that his opinion "is based on [his] experience in practicing engine failures, biannual flight reviews, check rides, things like that . . . ." *Id.* at 13.

The United States argues Robinson's opinion that the aircraft "could have made" Briggs Field, or that the aircraft had a "chance" of making it to Briggs Field, is speculation and should be excluded. Doc. 232 at 12. It argues his opinion is based solely on his experience, and that Plaintiff has failed to demonstrate how his experience leads to the conclusion reached, why his experience is a sufficient basis for the opinion, and how his experience is reliably applied to the facts. *Id.* at 10-11 (citing *Frazier*, 387 F.3d at 1261). The Motion points out that Robinson has never flown a plane the same model as the accident aircraft, has never performed a power-off glide to Briggs Field, could not recall the aircraft's best glide speed or its glide ratio, did not consider the winds on the day of the accident, did not observe Briggs Field from the air, did not reconstruct the accident, did not prepare the flight path depicted in his report, and did not inspect the wreckage. *Id.* at 11-12.

40

The United States suggests Robinson's piloting experience "is insufficient to overcome these shortcomings." *Id.* at 12.

In response, Plaintiff argues that Robinson's testimony is properly supported because, in Plaintiff's view, if Pilot Hunter "had been directed to Briggs, there is no question that he would have arrived there with altitude to spare." Doc. 249 at 10. However, despite this unequivocal statement, Plaintiff's brief does not provide any argument about how Robinson developed that opinion, or why Robinson's experience is sufficient to offer that opinion, or how Robinson applied his experience to reach that opinion. *Id.* That the opinion may be consistent with Defendant's expert's opinion does not get Plaintiff over the reliability threshold. Plaintiff has not borne her burden of showing that Robinson may reliably opine that the airplane "could have made" Briggs Field, or that the aircraft had a "chance" of making it to Briggs Field. Robinson does not offer any real methodology to reach that conclusion. The United States' request to exclude Robinson's opinions that the airplane could have made it to Briggs Field or had a "chance" of making it to Briggs Field, is, therefore, **GRANTED**. Doc. 232, in part. However, this does not prohibit Robinson from testifying about the distance between the

41

aircraft and Briggs Field at the time of the emergency, or that Briggs Field was the "closest" airfield.  *See* doc. 232-1 at 9.

### 3.    Robinson's Opinions Related to Cypress Lakes

Robinson's Report includes his opinion that "Hunter would have been able to make Cypress Lakes airfield," had the Controller "immediately provided heading and distance to the airfield."  Doc. 232-1 at 12.  The United States moves to exclude this opinion, since Robinson did no independent aerodynamic analysis, and instead simply cites to the reports of other experts, Leonard Fox and Mark Callender.  Doc. 232 at 13.  As the United States correctly points out, *id.* at 16, while "an expert's testimony may be formulated by the use of the facts, data and conclusions of other experts, [Cit.], such expert must make some findings and not merely regurgitate another expert's opinion."  *Eberli v. Cirrus Design Corp.*, 615 F. Supp. 2d 1357, 1364 (S.D. Fla. 2009) (internal quotations and citation omitted).  Plaintiff does not identify any independent analysis Robinson conducted to determine that the aircraft "would have been able to make Cypress Lakes," instead pointing to yet another expert's opinion that is consistent with that opinion.  Doc. 249 at 11-12.  Robinson's reliance on other expert's opinions is not sufficient to bolster

the reliability of his opinion. *See Schoen v. State Farm Cas. Co.*, 638 F. Supp. 3d 1323, 1335-37 (S.D. Ala. 2022) (discussing exclusion of expert opinion where expert simply repeated opinion from separate expert). The United States' request to exclude Robinson's opinion that the airplane could have made it to Cypress Lakes is, therefore, **GRANTED**. Doc. 232, in part.

### 4.    Robinson's Human Factors Opinions

Robinson is offered, in part, as an expert in human factors analysis. *See* doc. 232-1 at 3; 232-2 at 33; 249 at 3, 13. The United States argues that, through the "guise" of human factors analysis, Robinson offers opinions about Pilot Hunter's state of mind during the accident that are improper. Doc. 232 at 16. It also argues that his human factors opinions are speculative. *Id.* at 17; *see also* doc. 232 at 22 ("Robinson's 'human factors' opinions, including his new theories about 'cognitive overload' and 'Type III Spatial Disorientation' are nothing more than speculation about the pilot's state of mind, and must be excluded."). In particular, the United States challenges Robinson's opinions, from his Report, that Hunter appeared to be heading towards a location that "he may have believed to be Cypress Lakes," that the Controller's failure to provide

required navigational information "added to Hunter's apparent belief he was heading to Cypress Lakes," and that when the Controller told Hunter he was six miles away from Cypress Lakes, Hunter "realized he was not going to make any of the airfields offered by [air traffic control]." Doc. 232 at 17-18 (citing doc. 232-1 at 14). The United States also challenges Robinson's opinion, provided for the first time during his deposition, that one of his communications to the Controller is an indicator that Pilot Hunter was experiencing "Type 3 spatial disorientation." Doc. 232 at 19-20 (citing doc. 232-2 at 37).

Plaintiff, in arguing for the admission of Robinson's human factor opinions, points out that the United States does not challenge Robinson's qualifications in this area. *See* doc. 249 at 13. Even if it had, Plaintiff has borne her burden of demonstrating his qualifications. *Id.* Instead, the parties' dispute centers on whether Robinson's opinions are reliable. *See id.* at 13-16. Plaintiff argues that Robinson's testimony "is based upon his expertise and experience in the fields of piloting, human factors and accident reconstruction, both personally and professionally, and is consistent with the rigor that characterizes the practice in these fields." *Id.* at 14. However, it remains unclear how Robinson conducted any

44

analysis in this case relative to human factors. Plaintiff points out that "Mr. Robinson testified that he is 'giving his opinions regarding the human factors, associated aviation human factors with this case, which does include aspects of air traffic control and piloting aspects. Moreover, what the pilot was faced with regarding the challenges as introduced by not only the emergency, but by the air traffic controller.'" *Id.* (quoting doc. 232-2 at 33 (cleaned up)). Plaintiff then argues that "the Government never followed up on this subject." *Id.* However, it is not the Defendant's burden to demonstrate the reliability of Robinson's methods, it is Plaintiff's. *See Daubert*, 509 U.S. at 592 n. 10.

The Southern District of Florida's decision in *King v. Cessna Aircraft Co.*, 2010 WL 1980861 (S.D. Fla. May 18, 2010), is instructive in determining whether Robinson's opinions about Pilot Hunter's state of mind are appropriate in this case. There, the District Court excluded expert testimony that passengers "pressured" an airplane's crew to land as unreliable, because it was solely premised on the expert's subjective belief and unsupported by any evidence. *Id.* at *6. As the Court summarized, the expert opined that "because [the] crew decided to land in bad weather, it naturally follows that somebody had to pressure them

45

to do so." *Id.* The expert explained that his conclusion was based on two factors: 1) as an experienced pilot, the mere fact that the aircraft arrived in poor weather conditions after making an approach that the pilot should not have made gave him an indication the pilot was pressured by his passengers to do so; and 2) there was evidence that the pilot had been pressured in the past to get flight demonstrations done. *Id.* The Court found this opinion "patently unreliable," since the expert "essentially speculates as to the pilot's state of mind at the time of landing." *Id.* The Court ruled that the expert could explain to the jury the reasonableness or recklessness of the pilot's actions, but could not "so blatantly opine as to the pilot's state of mind that motivated those actions," since the expert utilized no methodology in reaching his conclusion. *Id.* The Court further explained that while the expert could testify, hypothetically, as to certain pressure that pilots face, and explain in descriptive fashion what factors can come into play that may cause a pilot to take off or land in poor weather conditions, but could not "take the next step" and opine that this particular pilot "must have" been distracted by his passengers. *Id.* at *7.

In contrast, the Court in *King* permitted the same expert to opine, more generally, that the pilots were distracted, based on the pilots conducting a series of extremely elementary fatal mistakes. *King*, 2010 WL 1980861, at *7-*8. The expert was permitted to testify that the combination of factors common in demonstration flights that create a "very high workload" for the crew must have distracted the crew as they made basic mistakes prior to the accident. *Id.* at *8. This opinion was supported by "explicit references to [the expert's] tangible experience and how the specifics of that experience led to his conclusion." *Id.*

In this case, Robinson's testimony and opinions about what Pilot Hunter believed, or realized, shortly before the crash, are more akin to the opinions about the crew's state of mind that the Southern District of Florida excluded in *King*. Plaintiff does not provide the "explicit references" to Robinson's "tangible experience" or "how the specifics of that experience led to his conclusion." 2010 WL 1980861 at *8. Instead, Robinson's testimony about what Pilot Hunter must have believed, or whether he was experiencing spatial disorientation, is completely speculative. *See, e.g.*, *Johnson v. Avco Corp.*, 702 F. Supp. 2d 1093, 1108 (E.D. Miss. 2010) ("There is no scientific basis for using [human factors

47

analysis] to determine a pilot's subjective state of mind by considering this sort of 'evidence.'"); *id.* at 1109 (human factors analysis "does not provide an investigator with a method of intuiting from a flight altitude, time of day, flight path, or wreckage pattern that a pilot succumbed to a spatial illusion rather than some other error"). Therefore, the United States' request to exclude Robinson's opinions about Pilot Hunter's state of mind, including his theories about 'cognitive overload' and 'Type III Spatial Disorientation,' is **GRANTED**. Doc. 232, in part. However, as in *King*, Robinson may offer testimony about the reasonableness or recklessness of the pilot's actions, and may discuss hypothetically, what a pilot might expect in an emergency situation from an air traffic controller, and explain what factors may impact a pilot's ability to navigate the emergency situation, but he may not "take the next step" and opine definitively about Pilot Hunter's state of mind.

## Conclusion

For the foregoing reasons, the United States of America's Motion to Exclude the Testimony of Plaintiff's Expert Mark N. Callender, Ph.D., is **DENIED**. Doc. 230. The United States of America's Motion to Exclude the Testimony of Plaintiff's Expert Charles Pereira is **GRANTED**. Doc.

48

231. The United States of America's Motion to Exclude the Testimony of Plaintiff's Expert Matthew Robinson is **GRANTED,** in part, and **DENIED,** in part. Doc. 232.

**SO ORDERED**, this 24th day of March, 2026.

_____
CHRISTOPHER L. RAY
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA